UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Willard G. Jeffers | ) | |
|     Plaintiff, | ) | 2:12-cv-02444 JWS |
| vs. | ) | ORDER AND OPINION |
| Farm Bureau Property & Casualty Insurance Company, | ) ) ) | [Re: Motion at Docket 31] |
|     Defendant. | ) ) | |

## I. MOTION PRESENTED

At docket 31 defendant Farm Bureau Property & Casualty Insurance Company ("Farm Bureau") moves for summary judgment pursuant to Rule 56 against plaintiff Willard G. Jeffers ("Jeffers"). Jeffers opposes at docket 46. Farm Bureau filed a reply at docket 52. Oral argument was not requested and would not assist the court.

## II. BACKGROUND

Jeffers' property in Glendale was among the thousands of Phoenix-area properties that were damaged in an October 5, 2010, hail storm. Jeffers reported the damage to Farm Bureau, his property insurance company, and they dispatched an adjuster to investigate. The adjuster, Michael Shearer, inspected the property on either

October 18 or October 19 and made notes of the damage he observed.[1]  Shearer inspected Jeffers' house, shed, gazebo, detached office, and pigeon loft.  Shearer did not immediately enter his notes into Farm Bureau's online database; he waited two to four days to do so.[2]

Shearer's notes reflect that he observed damage to Jeffers' dwelling and pigeon loft but "[n]o other damages to other structures."[3]  Shearer then arranged for a representative of KY-KO Roofing to inspect Jeffers' foam roof, who concluded that the roof had to be replaced.[4]  Shearer compiled a list of damages and their cost of repair into two "damages worksheets."  These worksheets list damage to foam and tile roofs on Jeffers' house, to the fiberglass roof on Jeffers' pigeon loft, and to a wood fence.  They also list unspecified "tree removal/cleanup."[5]  Although Shearer's notes state that Jeffers agreed with these worksheets and with the claim he prepared,[6] Jeffers denies that he had any conversations with Shearer about the scope of the damage and repair work that was needed.[7]  On October 23, Farm Bureau issued its first payment on Jeffers' claim.  It issued another payment on December 23 for recoverable depreciation after repairs were preformed.[8]

---

[1] Doc. 32 at 1–3. The exact date is unknown because the timestamp on Shearer's camera showed October 18, but his inspection notes list October 19 as the date of the inspection. Doc. 47-3 at 13 pp. 43–45.

[2] Doc. 47-3 at 13 pp. 43–45.

[3] Doc. 32-1 at 80.

[4] Doc. 32-1 at 73–74.

[5] Doc. 32-1 at 77–78.

[6] Doc. 32-1 at 81.

[7] Doc. 41-1 at 13 p. 40 ¶¶ 4–9.

[8] Doc. 32 at 4 ¶¶ 13–14.

In 2011 Jeffers submitted two additional claims to Farm Bureau related to the October 2010 hail storm. In January 2011, a heating and cooling contractor inspected Jeffers' air conditioning units. The contractor concluded that one of the units had extensive hail damage and needed to be replaced, and the other unit had "some hail damage" that "may be able to be combed out."[9] Jeffers submitted a claim to Farm Bureau. On January 8, Farm Bureau paid Jeffers 50 percent of the replacement value of the air conditioner that needed to be replaced (with the other 50 percent payable upon repair) and the full value of repair to the other unit.[10] In March 2011, Jeffers obtained a quote for the instillation of a new roof for his shed due to hail damage. Jeffers submitted the quote to Farm Bureau. Farm Bureau paid Jeffers the full amount.[11]

In September 2012 an independent adjuster, Austin Insurance Services, inspected Jeffers' property.[12] Austin Insurance Services' report concludes that Jeffers' property requires $50,936.86 in repairs due to hail damage.[13] Jeffers sued Farm Bureau in Arizona court in November 2012, alleging that Farm Bureau breached the insurance contract and the implied covenant of good faith and fair dealing. Farm Bureau removed the case to federal court.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14] The

---

[9] Doc. 47-4 at 9.

[10] Doc. 32-1 at 13–14.

[11] Doc. 47-11 at 2; Doc. 32-1 at 14.

[12] Doc. 32 at 6 ¶ 30.

[13] Doc. 32-3 at 6.

[14] Fed. R. Civ. P. 56(a).

materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[15] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[16] However, summary judgment is mandated under Rule 56 "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[17]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[18] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[19] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[20] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[21] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual

---

[15]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[16]*Id.*

[17]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[18]*Id.* at 323.

[19]*Id.* at 323-25.

[20]*Anderson,* 477 U.S. at 248-49.

[21]*Id.* at 255.

dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[22]

If summary judgment is not appropriate, Rule 56(g) empowers courts to issue partial summary judgment orders that specify facts or legal issues that are without controversy.

## IV.  DISCUSSION

**A. Breach of Contract**

To state a claim for breach of contract, a plaintiff must establish three elements: (1) an agreement; (2) a right thereunder; and (3) a breach by the defendant.[23]  A contract is breached "if a party fails to perform when performance is due."[24]  Jeffers argues that Farm Bureau breached its contractual duty to conduct an adequate investigation of his claim.  Farm Bureau does not dispute that the insurance contract obligated it to conduct an adequate investigation of Jeffers' claim.  Instead, it argues that the undisputed evidence shows that Shearer's investigation was adequate.

The court disagrees.  Jeffers cites the following evidence that tends to show that Shearer's investigation was inadequate:

- Shearer testified that he did not enter his inspection notes into Jeffers' electronic claim file for as many as four days, by which time he had inspected between 28 and 40 more properties damaged in the storm.[25]

---

[22]*Id.* at 248-49.

[23]*City of Tucson v. Superior Court of Pima Cnty.*, 569 P.2d 264, 266 (Ariz. Ct. App. 1977).

[24]*EastBanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1004 (D.C. Cir. 2008) (citing 9 Arthur L. Corbin, *Corbin on Contracts* § 943 (interim ed. 2002)).

[25]Doc. 47-3 at 13, p. 45; *id.* at 14, p. 49.

- Shearer's inspection notes and damages worksheets omit any reference to the hail damage to Jeffers' two rooftop air conditioning and heating units or the damage to the roof of Jeffers' shed.[26]
- Shearer testified at his deposition that he inspected the roof of Jeffers' shed from a ladder, instead of from the surface of the roof, because he does not "like to get up and climb around on tile roofs." Shearer could not remember if there were any parts of the roof that he could not see from the ladder.[27]
- When asked if he inspected the entire roof of Jeffers' pigeon loft, Shearer testified: "I don't remember. . . . I don't remember if it was a gable or if it was—but the slope that I looked at, I was able to see the entire slope; perhaps not the entire roof."[28]
- Shearer's testimony that he performed "one visual inspection" of the roof of Jeffers' gazebo, that it would have been impossible to view the entire roof from a ladder stationed on any one side of the gazebo, and that a roof inspection that does not inspect the entire roof is inadequate.[29]
- Shearer's admission that his inspection of the roof on Jeffers' detached office was inadequate because he was not able to view the entire roof.[30]

---

[26]Doc. 32-1 at 80–81.

[27]Doc. 47-3 at 21, pp. 76–77.

[28]*Id*. at 23, pp. 84–85.

[29]*Id*. at p. 79.

[30]*Id*. at pp. 80–81.

- The expert report of Charles M. Miller, which concludes that Shearer's inspection of the roofs on the house and pigeon loft was "insufficient and contrary to insurance industry claims handling standards."[31]
- The deposition testimony of DeAnna Hembd, Shearer's supervisor, that Farm Bureau expects "that an adjuster would actually get up on roofs of separate structures to verify whether or not there was hail damage."[32]

Despite this evidence, Farm Bureau raises three arguments why it should be granted summary judgment on Jeffers' breach-of-contract claim. First, it argues that Jeffers' factual assertions are "unsupported or are supported by inadmissible evidence."[33] This argument lacks merit. Farm Bureau does not explain why Shearer's and Hembd's deposition testimony cited above would be inadmissible. Further, Farm Bureau itself submitted Shearer's inspection notes and damages worksheets to the court as exhibits to Shearer's declaration. Farm Bureau objects to Charles M. Miller's report on hearsay grounds under Rule 56(c)(2) because it is not supported by an affidavit or declaration.[34] This objection misses the mark, however, because Rule 56(c)(2) states that a "party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence."[35] Farm Bureau does not explain why Jeffers would not be able to present the content of Mr. Miller's expert report at trial, for example through the testimony of Mr. Miller himself.[36] Nevertheless, even without considering Mr. Miller's report, Jeffers' evidence

---

[31] Doc. 47-8 at 15.

[32] Doc. 47-9 at 14 p. 47.

[33] Doc. 52 at 2.

[34] *See, e.g.*, Doc. 53 at 7 ¶ 36.

[35] Emphasis added.

[36] *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus

is sufficient to raise a question of material fact as to whether Shearer's inspection was adequate.

Second, Farm Bureau argues that Jeffers' evidence of Shearer's inadequate roof inspections is irrelevant because Jeffers is not "claiming any damage to those roof structures as part of [his] breach of contract claim."[37] This argument fails for several reasons. First, damages is not an essential element to a breach-of-contact claim. Even if Farm Bureau's alleged breach caused Jeffers no damages he would still be entitled to nominal damages.[38] Further, evidence that tends to show that Shearer's roof inspections were inadequate could lead a jury to reasonably conclude that Shearer's inspections were inadequate elsewhere.

Finally, Farm Bureau argues that even if the evidence shows that Shearer's investigation was imperfect, "[c]laims investigators are not perfect and cannot be expected to identify every possible item of damage."[39] This may be true, but the relevant question is whether Shearer conducted an adequate inspection, not a perfect one. Jeffers has presented sufficient evidence to preclude resolution of that question via summary judgment.

**B. Good Faith and Fair Dealing**

Every insurance contract includes an implied covenant of good faith and fair dealing whereby each party is bound to "refrain from any action which would impair the benefits which the other had the right to expect from the contract or the contractual

---

on the admissibility of its contents.").

[37] Doc. 52 at 4.

[38] *See Rawlings v. Apodaca*, 726 P.2d 565, 573 (Ariz. 1986) (en banc); Restatement (Second) of Contracts § 346(2) (1981) ("If the breach caused no loss . . . a small sum fixed without regard to the amount of loss will be awarded as nominal damages.").

[39] Doc. 52 at 4.

relationship."[40]  Pursuant to this covenant, an insurance company is not merely obligated to "pay certain claims when forced to do so;" instead, it must "play fairly with its insured" and treat the insured with equal consideration and honesty.[41]  This does not require perfection. So long as an insurance company "acts honestly, on adequate information and does not place paramount importance on its own interests, it should not be held liable because of a good faith mistake in performance or judgment."[42]

Farm Bureau cites *Noble v. Nat'l Am. Life Ins. Co.*,[43] and argues in order to establish his good faith and fair dealing claim Jeffers must prove (1) that there was no reasonable basis for the amount that Farm Bureau paid him and (2) Farm Bureau knew or should have known it lacked a reasonable basis for paying Jeffers that amount.[44]  Regarding this second element, Farm Bureau argues that it cannot be held liable for bad faith if its "position regarding contractual coverage is fairly debatable."[45]  This argument relies on pre-2000 case law.  Before 2000, Arizona courts held that a plaintiff's bad-faith claim would fail unless she could prove that her insurer's denial of coverage was not "fairly debatable."[46]  This rule allowed insurers to evade bad-faith

---

[40] *Rawlings*, 726 P.2d at 570.

[41] *Id.* at 570–71. *See also Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000) (en banc) ("The carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim. It should do nothing that jeopardizes the insured's security under the policy.").

[42] *Rawlings*, 726 P.2d at 573.

[43] 624 P.2d 866, 868 (Ariz. 1981).

[44] Doc. 31 at 8–9.

[45] *Id.* at 12.

[46] *See, e.g., Tobel v. Travelers Ins. Co.*, 988 P.2d 148, 156 (Ariz. 1999) (citing *Noble*, 624 P.2d at 868).

liability even if their claim-processing practices were faulty or their motivations were improper so long as the insurer's ultimate claim decision was fairly debatable.[47]

In 2000 the Arizona Supreme Court modified this test in *Zilisch v. State Farm Mut. Auto. Ins. Co.*, holding that the "fair debatability" of the insurer's coverage decision is not sufficient to defeat a bad-faith claim.[48] Instead, *Zilisch* held that bad-faith liability extends not only to coverage decisions, but to any instances where the insurer (1) acted unreasonably "in the investigation, evaluation, and processing of the claim" and (2) "either knew or was conscious of the fact that its conduct was unreasonable."[49] The first element is analyzed objectively, the second is analyzed subjectively,[50] and both elements present fact questions ordinarily reserved for the jury.[51]

To support the first element of his bad-faith claim, Jeffers relies mostly on the same evidence regarding Shearer's allegedly inadequate investigation that is discussed above. Regarding the second element, that Shearer knew or should have known his investigation was unreasonably inadequate, Jeffers points to Shearer's 25 years of experience as an insurance adjuster[52] and 15 years of experience as a Senior Field Claim Representative for Farm Bureau.[53] Additionally, Jeffers offers Shearer's deposition testimony that his job performance is reviewed annually for the amount of

---

[47] *Zilisch*, 995 P.2d at 279.

[48] *Id.* at 280. *See also Prieto v. Paul Revere Life Ins. Co.*, 354 F.3d 1005, 1009–10 (9th Cir. 2004).

[49] *Zilisch*, 995 P.2d at 280. *See also Lennar Corp. v. Transamerica Ins. Co.*, 256 P.3d 635, 642 (Ariz. Ct. App. 2011).

[50] *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 277 P.3d 789, 794–95 (Ariz. Ct. App. 2012), *review denied* (Jan. 8, 2013), *cert. denied*, 133 S. Ct. 2804 (U.S. 2013).

[51] *Zilisch*, 995 P.2d at 280; *Lennar Corp.*, 256 P.3d at 644; *Acosta v. Phoenix Indem. Ins. Co.*, 153 P.3d 401, 405 (Ariz. Ct. App. 2007).

[52] Doc. 47-3 at 7 p. 18 ¶¶ 15–18.

[53] Doc. 47-3 at 4 p. 9 ¶¶ 9–17.

"leakage" or overpayments made on his claims. This includes, for example, payments for painting a wall that did not need to be painted.[54] Farm Bureau objects to this testimony, arguing that it is irrelevant under Fed. R. Evid. 402 and that its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury under Fed. R. Evid. 403. *Zilisch*, however, specifically held that the fact that an insurance representative's pay was influenced by the amount that was paid out on his claims could support a jury finding of bad faith.[55] Although Jeffers' evidence that Farm Bureau motivated its employees to minimize overpayments is weaker than the evidence at issue in *Zilisch*—evidence that the company set arbitrary goals for the reduction of claims paid—it is nonetheless relevant. It tends to show that Shearer may have been motivated to under-report Jeffers' damages. This evidence's probative value is not substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury.

Because reasonable jurors could find that Farm Bureau's inspection was unreasonable and Farm Bureau knew or should have known it, summary judgment is inappropriate.

**C. Punitive Damages**

In a bad-faith case, "punitive damages are only recoverable under special circumstances."[56] Although a failure to investigate may be sufficient to establish bad-faith liability, that failure does not necessarily rise to the level required to establish punitive damages.[57] To recover such damages the plaintiff "must prove that

---

[54]Doc. 47-3 at 10 p.33 ¶¶ 21–25; *id*. at 11 p.34 ¶¶ 5–16.

[55]*Zilisch*, 995 P.2d at 280 ("There was sufficient evidence in this case from which a jury could find that State Farm acted unreasonably and knew it. There was evidence that State Farm set arbitrary goals for the reduction of claims paid. The salaries and bonuses paid to claims representatives were influenced by how much the representatives paid out on claims.").

[56]*Rawlings*, 726 P.2d at 578.

[57]*Id*.

defendant's evil hand was guided by an evil mind" by showing that the defendant either intended to injure the plaintiff or "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others."[58]

Jeffers has not presented any evidence that would support a jury finding that Farm Bureau's actions were guided by an evil mind.  There is no evidence that Farm Bureau intended to injure Jeffers, nor evidence that it knowingly engaged in conduct that created a substantial risk of causing Jeffers significant harm.  Jeffers may not recover punitive damages.

## V.  CONCLUSION

For the reasons stated above, Farm Bureau's motion at docket 31 is **GRANTED** to the extent that Jeffers may not recover punitive damages.  In all other respects, Farm Bureau's motion at docket 31 is **DENIED**.

DATED this 28th day of August 2014.

/s/ JOHN W. SEDWICK
SENIOR UNITED STATES DISTRICT JUDGE

---

[58]*Id.*